[Civ. No. 7174. Second Appellate District, Division Two.—June 15, 1932.]

ELIHU SLOAN, as Guardian, etc., Respondent, v. ORIGI-NAL STAGE LINE, INC., (a Corporation), Appellant.

B. P. Gibbs for Appellant.

No appearance for Respondent.

THOMPSON (IRA F.), J.—This is an appeal from a judgment for the sum of $10,000 in favor of the plaintiff for personal injuries suffered by his ward and against the appealing defendant.

The grounds of the appeal may be stated as follows: (1) The doctrine of *res ipsa loquitur* was improperly applied, first, because the proof established negligence on the part of the co-defendant and second, because the complaint alleges specifically the negligent acts complained of, (2) that in addition to instructions embodying this doctrine the court gave other erroneous instructions and (3) that the verdict is excessive.

We are supplied with no brief by the respondent, who was a passenger on the bus of the appellant. However, it is sufficient to say that the evidence adduced in this case brings it squarely within the law announced in *Burke* v. *Dillingham*, 84 Cal. App. 736 [258 Pac. 627], and the authorities there cited, in so far as the doctrine relating to the presumption of negligence is concerned. Also, the testimony of the defendant Koenig was sufficient—stating, as he did, that the driver of the bus approached the intersection at a speed of about thirty-five miles an hour and ran into him while he was attempting to cross at five miles an hour—to authorize the jury to find that respondent was guilty of negligence. Also, it may be noted that practically all of the witnesses placed the speed of the bus considerably in excess of fifteen miles per hour.

 The complaint alleges that "the defendant Original Stage Line, Inc., did then and there so carelessly, negligently, recklessly and unlawfully propel, operate, manage and control· said motor bus so as to cause the same to collide with the automobile of the defendant". The quota-

tion demonstrates that the complaint falls far short of setting out "specifically the negligent acts or omissions complained of".

■ The instructions of which appellant complains are based upon the law relative to the right of way of vehicles entering an intersection. It is the contention of appellant that inasmuch as its bus was traveling upon a main or "Stop" boulevard, even though Koenig came to full stop before proceeding to cross, and although he approached "from the right", that the bus was not required to yield the right of way. Appellant's counsel says: "The purpose of the boulevard stop is to require that vehicles approaching a main highway be brought to a complete stop and to remain there until they can with safety get started across the intersection before cars traversing the boulevard enter thereon. To hold that the vehicle approaching from the right after having stopped at the boulevard stop sign would still be entitled to the right of way against those coming from the left along the main highway, and those at the left be required to wait until the other car had started up again and passed, would be to seriously impede the traffic on the main artery and render ineffect[ive] an important part of the purpose of the boulevard stop." The accident here in litigation occurred February 24, 1928, and at that time the provisions of the California Vehicle Act with respect to the right of way contained no such exception as that which counsel would have us insert by a process of judicial legislation. We have no authority to enter this domain of government.

■ We therefore proceed to examine the contention of appellant that the verdict is excessive—that is to say, so large as to indicate to us that it was arrived at as the result of passion or prejudice on the part of the jury. The injured lady, the ward, was twenty-eight years of age at the time of the accident—apparently in good health. She described the injury to herself as follows: "Well, I struck my neck against the window and then hit on the—and then my side and then I hit my head against the floor. I just became numb for about five minutes and then when I got to my seat when the bus driver came and got me up. Well then it seems to me like all at once something broke loose and I was helpless. I was not unconscious or anything. I

could not walk, I could not walk alone.'' Other testimony produced by the plaintiff establishes an extreme condition of nervous disorder evidenced by inability to sleep—a constant twitching and jerking of the muscles, with complaints by Mrs. Henry of pain in the head, neck and shoulders. For example, the family physician who examined her after the accident testified that he ''found her exceedingly nervous and nauseated, vomiting, complaining of pain in the occipital region and also along the spine—the side''; that she was suffering from traumatic chorea, which is ''a disorder of the motor nerves, it causes a kind of jerking or contraction of the nerves. The individual is unable to keep still'' and that ''throughout all of that time (i. e., to the time of trial on July 26, 1929) the girl was exceedingly nervous and upset. It seems that the nervous system was thrown entirely out of gear and she was just—well the condition was really pitiable that she was in. She was unable to control herself, hardly able to eat her food, or rest at any time, and at night she was unable to sleep—just completely upset.'' Her brother gave the following very graphic picture of her condition: ''She was very nervous on February 24th and from then on she was unable to dress herself at times and did not eat herself but we had to feed her and had to put her clothes on her. She was excited, would get out of bed and hide. I would come home from work and she would not recognize me. She would not let no one see her but my wife, and she was so bad that I could not care for her. Instead of growing better she grew worse. She seemed to have lost her mind and her mentality was very bad. She could not sleep at night. I had to get up out of bed with my wife and sleep with her until she could go to sleep. We had to keep the lights burning all night for her. At times she would wake up at night and come into our bedroom or go into the front room and sleep on the floor. She would want to climb out of the windows and go into the bath tub and turn on the water and say she had been to the beach. At times she did not know her mind. She was afraid of everybody. She did not recognize anybody only my wife. She recognized her.'' Another physician testified she was suffering from chorea. The general hospital, the records of which were produced at the instance of the appellant, took a blood test which disclosed a result of four plus. It is claimed

by appellant that the mental or nervous disorder is the result of or largely contributed to by this condition. However, the family physician testified quite positively to the contrary and in fact the hospital records disclose a negative condition of the spinal fluid, and Dr. Steele, a member of the lunacy commission, records this: "Had four plus blood Wasserman two months ago when patient was in medical ward. While there had spinal fluid which was absolutely negative and had no signs of nervous involvement, think it was a peculiar functional condition resulting from the accident." Her family physician testified with respect to the continuation of the nervous affliction as follows: "The prognosis in her case is what I would call unfavorable—that she will be bothered with these attacks for the balance of her life, that is [what] I believe about it." It cannot be seriously argued, in view of the state of the record, that this case calls for our interposition on the ground that the verdict is so gross as to indicate passion or prejudice. There is pictured to us a condition more excruciating in its manifestation and mental suffering than the loss of a member of the body.

Judgment affirmed.

Works, P. J., and Fricke, J., *pro tem.*, concurred.